## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| THE ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, ET AL., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Court No. 22-00028 |
| v. | ) ) | |
| UNITED STATES, | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

The Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members (Aleris Rolled Products, Inc.; Arconic Corporation; Commonwealth Rolled Products Inc.; Constellium Rolled Products Ravenswood, LLC; Jupiter Aluminum Corporation; JW Aluminum Company; and Novelis Corporation) (collectively "Plaintiffs") through their attorneys, allege and state as follows:

## JURISDICTION

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c), as this action is brought pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and (a)(2)(B)(iii).

2. Plaintiffs contest certain factual findings and legal conclusions in the United States Department of Commerce's ("Commerce" or "the Department") first administrative review of the antidumping duty order on <u>Common Alloy Aluminum Sheet from China</u> (Commerce Case No. A-570-073). The Department's final results were published as <u>Common Alloy Aluminum Sheet From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Successor-In-Interest Determination, and Final</u>

Determination of No Shipments; 2018–2020, 86 Fed. Reg. 74,066 (Dep't Commerce Dec. 29, 2021) (hereinafter, "Final Results") and the accompanying Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Common Alloy Aluminum Sheet from the People's Republic of China; 2018-2020 (Dep't Commerce Dec. 22, 2021) (hereinafter, "Issues and Decision Memorandum"). Following the Domestic Industry's submission of comments on alleged ministerial errors in the Final Results, the Department published amended final results as Common Alloy Aluminum Sheet From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review, 2018–2020, 87 Fed. Reg. 6,504 (Dep't Commerce Feb. 4, 2022).

## STANDING OF PLAINTIFFS

3.    The individual members of the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group are manufacturers, producers, and/or wholesalers in the United States of the domestic product that is like common alloy aluminum sheet. Additionally, the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group is a trade or business association, a majority of whose members manufacture, produce, or wholesale the domestic like product in the United States. Plaintiffs participated actively in the administrative review as parties to the proceeding. As such, Plaintiffs are interested parties within the meaning of section 771(9)(C) and (E) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(9)(C), (E), and Plaintiffs have standing to bring this action pursuant to 28 U.S.C. § 2631(c).

## TIMELINESS OF THIS ACTION

4.    The Final Results were published in the Federal Register on December 29, 2021 (86 Fed. Reg. 74,066). Pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and U.S. CIT Rule 3(a), a

Summons was filed within 30 days of the date on which the Final Results were published in the Federal Register (see ECF No. 1, dated January 28, 2022) and this Complaint is being timely filed within 30 days of the filing date of the Summons.

## STATEMENT OF CLAIMS AND BASIS FOR RELIEF

## COUNT I

5. Paragraphs 1 through 4 above are re-alleged and incorporated herein by reference.

6. The statute directs the Department to value a non-market economy ("NME") respondent's factors of production using surrogate value information from one or more market economy ("ME") countries that are "at a level of economic development comparable to that of the nonmarket economy country" and are "significant producer{s} of comparable merchandise." 19 U.S.C. § 1677b(c)(4). The Department's well-established practice for selecting a surrogate ME country to value a respondent's factors of production in proceedings involving merchandise from a NME country follows three steps and is summarized in Policy Bulletin 04.1 : Non-Market Economy Surrogate Country Selection Process (Mar. l, 2004) (available at: https://enforcement.trade.gov/policy/bull04-1.html) (hereinafter, "Policy Bulletin 04.1").

7. The first step in the Department's process for selecting a surrogate ME country is to request that Enforcement & Compliance's Office of Policy prepare a list of potential surrogate ME countries ("the OP List") that are at the same level of economic development as the NME country at issue. It is the Department's practice to consider each potential surrogate ME country on the OP List to at the same level of economic development as the NME country at issue. See Policy Bulletin 04.1 at 2 ("The surrogate countries on the list are not ranked and should be considered equivalent in terms of economic comparability."). The Department then identifies the ME countries on the agency's OP List that were significant producers during the segment's

period of review ("POR") of merchandise that is identical or comparable to the subject merchandise.  See Policy Bulletin 04.1 at 2 (stating that "{s}econd, the operations team identifies those counties with producers of comparable merchandise among potential surrogates on" the OP List).  Only if there are multiple countries that are economically comparable to the NME country at issue *and* that are significant producers of identical or comparable merchandise, will the Department then evaluate which of these countries has "the best factors data" and select that country as the primary surrogate country.  See id. at 4.

8. Based on per capita gross national income data published by the World Bank for 2018 and 2019, Commerce determined that the following countries were economically comparable to China during the period of review: Brazil, Bulgaria, Malaysia, Mexico, Romania, Russia, and Turkey.  See Issues and Decision Memorandum at 12-13.

9. Additionally, the Department determined that Bulgaria is a significant producer of comparable merchandise.  See Issues and Decision Memorandum at 14-15.  As a result, even though the Department did not select Bulgaria as the primary surrogate country, it did determine that Bulgaria satisfied the statutory requirements for qualifying as a potential ME surrogate country.  See id.

10. The Department's determination that Bulgaria is a significant producer of comparable merchandise is not supported by substantial evidence and is not otherwise in accordance with law.

11. In particular, trade data show that Bulgaria exported only a small volume of merchandise that is comparable to the subject merchandise during the period of review. Moreover, Bulgaria has a negative trade balance on a value basis and only a small positive balance on a quantity basis with respect to trade in comparable merchandise.  In contrast, other

economically comparable countries Turkey, Russia, and Romania had substantial positive trade balances of comparable merchandise on both a quantity and value basis, and exported substantially greater volumes and values of aluminum sheet than Bulgaria on an absolute basis. In addition, a 2017 report prepared by the U.S. International Trade Commission ("USITC") concerning the global aluminum market includes a lengthy analysis of aluminum production operations in the various member states of the European Union ("EU"), but makes no mention of aluminum-related operations in Bulgaria (other than to note the country is a member of the EU). The failure of the USITC to consider and discuss Bulgaria in its report is further evidence that Bulgaria is not a significant producer of merchandise that is comparable to the subject merchandise.

12. While the Department acknowledged this detracting evidence in the <u>Issues and Decision Memorandum</u>, it failed to explain how the record as a whole demonstrates Bulgaria is a significant producer of comparable merchandise. As a result, the Department's determination that Bulgaria is a significant producer of comparable merchandise is not supported by substantial evidence and is not otherwise in accordance with law.

## COUNT II

13. Paragraphs 1 through 12 above are re-alleged and incorporated herein by reference.

14. The Department applied an incorrect standard in determining that Bulgaria was a significant producer of comparable merchandise. The Department determined that Bulgaria qualified as a significant producer of comparable merchandise because it did not agree "that the record establishes that Bulgaria *is not* a significant producer." <u>Issues and Decision Memorandum</u>, at 14 (emphasis added). The statute, however, requires the Department to value a

NME respondent's factors of production using surrogate value information from one or more ME countries that are "significant producer{s} of comparable merchandise." 19 U.S.C. § 1677b(c)(4). As a result, there must be affirmative evidence to support a determination that Bulgaria *is* a significant producer – not evidence demonstrating Bulgaria *is not* a significant producer.

15. The Department also failed to explain why Bulgaria's volume of exports were sufficient to qualify the country as a significant producer. The Department stated that it found Bulgaria's export quantity to "qualif{y it} as a significant producer of comparable merchandise," but failed to explain why this quantity is considered significant.

16. Because the Department applied the wrong standard and failed to articulate a satisfactory explanation for its conclusion, the Department's determination that Bulgaria is a significant producer of comparable merchandise is not supported by substantial evidence and is not otherwise in accordance with law.

## COUNT III

17. Paragraphs 1 through 16 above are re-alleged and incorporated herein by reference.

18. The statute directs the Department to value a respondent's factors of production based on the "best available information." 19 U.S.C. § 1677b(c)(1). As that statutory term is not defined, the Department has "broad discretion to determine what constitutes the best available information." Qingdao Sea-line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014). The agency has, however, identified criteria and guidelines for determining what information constitutes the "best available." In particular, the Department typically evaluates the degree to which data are publicly available, contemporaneous with the POR, tax and duty

exclusive, representative of a broad market average, and product-specific. See Policy Bulletin 04.1, at 4; Baoding Mantong Fine Chemistry Co. v. United States, 222 F. Supp. 3d 1237, 1247 (Ct. Int'l Trade 2017) (hereinafter, "Baoding Mantong").  Moreover, the Department prefers to value all factors in a single country, a preference that has been sustained as reasonable by the U.S. Court of International Trade.  See 19 C.F.R. § 351.408(c)(2); Clearon Corp. v. United States, 2013 Ct. Intl. Trade LEXIS 27, at *20-21 (Feb. 20, 2013).  Importantly, the Department may not select as the best available information, data that are from a country that does not satisfy the statute's ME criteria.  See 19 U.S.C. § 1677b(c)(4).

19. In the Final Results, the Department selected the financial statement of Alcomet AD ("Alcomet"), a Bulgarian producer of aluminum products, as the "best available information" to value Alcha's financial ratios.  Because the Department's determination that Bulgaria is a significant producer is unlawful (as set forth in Counts I-II), the Department's reliance on the Alcomet financial statement to calculate surrogate financial ratios is not supported by substantial evidence and is not otherwise in accordance with law.

## COUNT IV

20. Paragraphs 1 through 19 above are re-alleged and incorporated herein by reference.

21. The Department erroneously calculated surrogate financial ratios using Alcomet's financial statement.  Specifically, the Department excluded the expense line item "Sales Commissions" from the calculation of surrogate financial ratios, instead of classifying those expenses as part of selling, general, and administrative (SG&A) expenses.  This is at odds with the Department's long-standing practice of treating sales commission expenses as SG&A expenses in calculating surrogate financial ratios.  See, e.g., Issues and Decision Memorandum

for the Antidumping Duty Investigation of Certain Tissue Paper Products from the People's Republic of China, at 9 (Feb. 3, 2005), ref'd in 70 Fed. Reg. 7,475 (Dep't Commerce Feb. 14, 2005) (final determination); Issues and Decision Memorandum for the Antidumping Investigation of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China, at 48 (July 7, 2008), ref'd in 73 Fed. Reg. 40,485 (Dep't Commerce July 15, 2008) (final determination) (finding that the total selling expenses of the surrogate producer represent the total expenses incurred for selling the product, including commissions).

22. In addition, the Department erroneously excluded the expense line item "Taxes" from the calculation of the SG&A expenses and the resulting financial ratio. These taxes are different in nature compared to taxes such as income taxes, which should be excluded from the calculation, as these tax expenses were reported in the company's audited financial statements under "administrative expenses" and, thus, should be classified as such by the Department. All expenses classified as an administrative expense by the surrogate company should be included in the calculation of the SG&A financial ratio.

23. The Department also classified the item "Sales of Materials" listed under the category "Other Income" inconsistently and incorrectly. The Department classified this item as an offset to SG&A expenses, yet the corresponding expense item under "Other Expenses," "Cost of materials and services sold," was classified as a raw material expense. The item "Sales of Materials" must be classified under the same category, i.e., related to raw materials, because otherwise the resulting financial ratios will be distorted as a result of treating the corresponding income and expense items differently in the calculation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

    (a)    Determine that Commerce's <u>Final Results</u> are not supported by substantial evidence and are not otherwise in accordance with law with respect to the claims advanced by Plaintiffs in this Complaint;

    (b)    Remand the <u>Final Results</u> to Commerce with instructions to correct the errors set forth in this Complaint; and

    (c)    Provide such other relief as this Court deems just and appropriate.

    Respectfully submitted,

    /s/ John M. Herrmann_____
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Plaintiffs

Dated: February 25, 2022

## CERTIFICATE OF SERVICE AND NOTICE TO INTERESTED PARTIES

### Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group et al. v. United States
### CIT Court No. 22-00028

Pursuant to Rule 3(f) of the Rules of the Court of International Trade, I, John M. Herrmann, hereby certify that on February 25, 2022, copies of the foregoing Complaint were served upon the following individuals and notified all the interested parties who were a party to the proceeding below, by certified mail, return receipt requested:

### UPON THE UNITED STATES

Attorney-In-Charge
International Trade Field Office
Commercial Litigation Branch
U.S. Department of Justice
26 Federal Plaza
New York, NY 10278-0001

Director, Civil Division
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W., Room 12124
Washington, DC 20530

### UPON THE U.S. DEPARTMENT OF COMMERCE

General Counsel
U.S. Department of Commerce
14th Street & Constitution Avenue, N.W.
Washington, DC 20230

Ms. Evangeline Keenan, Esq.
Director, APO/Dockets Unit
U.S. Department of Commerce
14th Street & Constitution Avenue, N.W.
Room 1874
Washington, DC 20230

**On behalf of Shanghai Huafon Aluminium Corporation and Xiamen Xiashun Aluminum Foil Co., Ltd.**

Matthew J. McConkey, Esq.
mmcconkey@mayerbrown.com
Mayer Brown, LLP
1999 K Street, NW
Washington, DC 20006-1101


**On behalf of Alcha International Holdings Limited; Jiangsu Alcha Aluminium Co., Ltd.; and Yinbang Clad Material Co., Ltd.**

Daniel Cannistra, Esq.
dcannistra@crowell.com
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595


**On behalf of Texarkana Aluminum, Inc.**

Peter J. Koenig, Esq.
peter.koenig@squirepb.com
Squire Patton Boggs (US) LLP
2550 M Street, N.W., Suite 300
Washington, DC 20036


**On behalf of AA Metals, Inc. and Teknik Aluminyum Sanayi A.S.**

Kristen Smith, Esq.
ksmith@strtrade.com
Sandler, Travis & Rosenberg, P.A.
1300 Pennsylvania Avenue, N.W., Suite 400
Washington, DC 20004-3002

**On behalf of Tianjin Zhongwang Aluminium Co., Ltd.**

Bruce M. Mitchell, Esq.
bmitchell@gdlsk.com
Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP
1201 New York Avenue NW, Suite 650
Washington DC 20005

                                               /s/ John M. Herrmann
                                               JOHN M. HERRMANN
                                               KELLEY DRYE & WARREN LLP